UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

KEN HODAK,                          )
                                    )
    Plaintiff,               )    Civil Action No. 5:07-5-JMH
                                    )
v.                                  )
                                    )
MADISON CAPITAL MANAGEMENT,         )
LLC, et al.,                        )    **MEMORANDUM OPINION AND ORDER**
                                    )
    Defendants.              )
                                    )

** ** ** ** **

This matter is before the Court on the parties' cross-motions for summary judgment filed by Plaintiff Hodak [Record No. 87], Defendants Madison Capital Management, LLC, and Madison Investment Partners 24, LLC (collectively, "Madison Defendants") [Record No. 90], and Defendants UAR GP Services, LLC, UAR GP, LLC, UAR GP Holdco, LLC, United American Resources, LP, and UAR MLP, LLC (collectively, "UAR Defendants") [Record No. 91]. Responses have been filed [Record Nos. 98, 99, and 100], as well as replies [Record Nos. 102, 103, and 104]. These motions are now ripe for consideration.

I.   **BACKGROUND**

    A.   **FACTUAL BACKGROUND**

From December 2006 through April 2006, individuals representing UAR GP Services and the Madison Defendants contacted Hodak on numerous occasions, seeking to recruit him as an officer

-1-

for a company known as UAR GP Services.  Eventually, Hodak accepted employment with Defendants as the CEO of the Non-GP Services Entities and UAR GP Services in May 2006.  [*See* Employment Agreement, dated May 12, 2006, Exh. 1 to Record No. 87].

Among other things, under the Employment Agreement, UAR GP Services was to provide Plaintiff with use of a suitable vehicle, with precise arrangements to be made at a later date.  [*See* Employment Agreement ¶ 4(d).]  Plaintiff and Gordon reached an agreement that Plaintiff would purchase a vehicle of his choice and that he would be reimbursed for the "capital costs," out-of-pocket costs, and mileage.  [Record No. 89-38]  Plaintiff purchased a car in June 2006 and, over the course of his employment, was "reimbursed for everything [he] submitted."  [Record No. 89-27, January 16, 2007, Deposition of Kenneth F. Hodak, Vol. II (hereinafter, "Hodak depo., Vol. II") at 17-18, 21.]

The Employment Agreement also provides that Hodak's contract could be terminated at any time:

> (1)  without Cause, upon five business days' written notice to Executive; or
>
> (2)  immediately upon the showing of Cause. For purposes of this Agreement, "Cause" shall mean:
>
> > (I)  the continued and willful misconduct or dereliction by Executive in the performance of his duties (other than any such failure resulting from Executive's incapacity due to a physical or mental disability), after a demand for performance is delivered to Executive by

-2-

the Board of Managers (which demand shall identify in reasonable detail the facts and circumstances providing the basis for the Board believing that Executive has not performed his duties) and Executive is given a period of not less than thirty (30) days to cure the performance deficiencies;

(ii) the conviction of Executive by a court of competent jurisdiction of, or any entry of a plea or nolo contendere with respect to a felony or other crime which involves fraud, dishonesty or moral turpitude and which has resulted or is likely to result in material economic damage or otherwise materially adversely affect the Company;

(iii) Executive shall have refused, after written notice and being given a period of not less than thirty (30) days to obey, any lawful resolution of, or direction by the Company relating to the performance of his duties hereunder;

(iv) Executive willfully engaging in conduct which has resulted or is likely to result in material economic damage to the Company;

(v) a material breach of this Agreement, which breach is not cured by Executive within 10 calendar days of receiving notice from the Company of such breach, or the Confidentiality Agreement executed by Executive;

(vi) failure by Executive to cooperate in any internal investigation; or

(vii) an act or acts of dishonesty by Executive involving the Company or any of its Affiliates.

[Employment Agreement at §9(a).]

Hodak and UAR GP Services also entered into a Non-Competition

-3-

Agreement which contains provisions regarding confidentiality, specifically that Hodak would not "disclose to anyone 'Confidential Information'". [*See* Record No. 89-36 at 2-3.] The UAR Companies also entered into confidentiality agreements with those acquisition targets with which they had signed letters of intent which forbade public disclosure by any representative of the UAR Companies of the fact that the parties were in negotiation, as well as of the specific matters being negotiated. [*See* Record No. 89-37, Confidentiality Agreement Between UAR and TRI ¶ 3 (Feb. 14, 2006) ("The Receiving Party shall not make any public disclosure, or permit any of its Representatives to make any public disclosure, concerning the subject matter of this Agreement, the existence of any possible Transaction or the Receiving Party's consideration of a transaction . . . . ").]

Hodak's tenure with UAR GP Services was ultimately short-lived and somewhat rocky. Plaintiff was told repeatedly by Chauncey Curtz, the Chairman of the Board, that he must make progress and move things forward, yet Curtz felt that Hodak failed to take any steps to improve his performance or cure those deficiencies. Curtz communicated his concerns about Hodak's performance to him during June or July 2006, as follows:

> Ken and I talked frequently during this period, and I know I expressed to Ken, as did other people, concern about the fact that the projects needed to be done quickly. You know, we talked a lot about what needed to be done, who needed to be doing what, reporting responsibility, other issues

-4-

and other things that needed to be accomplished in order to move the project ahead. And I know I expressed concern about the pace at which a lot of those things were being done.

> . . . .
>
> . . . I know I was concerned about the lack of a controller. I know I was concerned about the lack of a CFO. I know that I was concerned about getting the acquisitions that we were in the process of neogitating and do due diligence on completed. I know I was concerned about getting additional, you know, targets lined up, and in the process of negotiations, moving ahead so that in the event one of these didn't get closed, there would be a second plan, a backup. And in addition to that, even if we didn't need a backup, that there would then be other acquisitions in the pipeline ready to go when the MLP became a public offering. So we talked about all those things. We talked about how to do this. We talked about the nuts and bolts of who should be doing what. We talked repeatedly about the need for confidentiality in these negotiations, in these discussions, and we, you know, we talked generally about the fact that I had real concern that things weren't moving ahead as quickly as they ought to.

[Record No. 89-29, January 22, 2008 deposition of Chauncey Curtz (hereinafter, "Curtz depo.") at 77-80.]

On August 24, 2006, Curtz engaged Hodak in discussion of "whether or not . . . [Hodak] would retain his job and whether or not he was able to carry out these duties and whether or not . . . he was performing what was required of him to perform in order to implement the business plan . . . ." [*Id.* at 101.] On August 30, 2006, Curtz had "a very frank conversation" with Hodak in which he

-5-

reiterated his concerns about Hodak's shortcomings as CEO.  [*See* Record No. 89-41.]  At another meeting in late August with Baum and Hodak, Curtz "express[ed], among other things, a belief that Ken Hodak was not providing adequate leadership, that UAR was not achieving certain objectives that were, in [Curtz's] view, expected of it."  [Record No. 89-30, March 20, 2008 deposition of Jonathan Baum (hereinafter, "Baum depo.") at 25.]  At that meeting, Curtz made it clear to Hodak that the issue was serious and, in Baum's words, "was sort of an engagement level issue, meaning this is so serious that it calls into question how we're going forward and whether we're going forward."  [Baum depo. at 41.]

Thus, in many respects the writing was on the wall by August 30, 2006, when Hodak confirmed to representatives of Thompson Tractor, a Caterpillar equipment dealer, that the TRI deal was in the works.  [*See* Record No. 89-31, May 6, 2008 Deposition of Sam Johnson (hereinafter, "Johnson depo.") at 110-12; Record No. 89-42, August 31, 2006 email correspondence from K. Hodak to K. Hatch, et al.].  Then, on September 12, 2006, Hodak confirmed to representatives of Tractor and Equipment Company, a Komatsu dealer, that UAR GP Services was involved in negotiations with TRI and Mann Steel.  [Johnson depo. at 121.]  Johnson informed Curtz of Plaintiff's conversation with the Komatsu dealer, and Plaintiff told Curtz and others about the conversation with the Caterpillar dealer.  [*Id.* at 122, Curtz depo. at 92-93.]

In early September 2006, Curtz expressed to Hodak his displeasure with how things were going.  Throughout September 2006, Curtz and Gordon addressed with Hodak the lack of progress being made in the due diligence process, breaches of confidentiality, and Hodak's leadership failures.  Hodak was warned on multiple occasions about the importance of confidentiality in his role as CEO.  [Curtz. depo. at 90, 95-96.]

Ultimately, Hodak's employment with UAR GP Services was terminated on September 29, 2006, less than five months after his hire.  The termination of employment was effected by a telephone call from UAR GP Services' counsel, Baum, who admittedly offered no "description whatsoever of what the cause was that the company believed it had to terminate him" during the phone call.  [Record No. 87-5, Baum Depo. at 62-64; *see also* Record No. 89-26, December 21, 2007, Deposition of Kenneth F. Hodak, Vol. I (hereinafter, "Hodak depo., Vol. 1") at 227-28.]  Nonetheless, Baum informed Hodak that the termination was for cause and further informed Hodak that he had the option of resigning, in which case he would receive a severance package.  [Baum depo. at 61-63; Hodak depo., Vol. 1, at 228.]  Plaintiff declined the offer of voluntary resignation with a severance package, and his termination was effective immediately. [Baum depo. at 65.]

Ultimately, Bryan Gordon, Chairman and Managing Director for Madison, made the decision to terminate Hodak.  Hodak's breaches of

confidentiality were among the universe of missteps perceived by Hodak's employer which ultimately led to the termination of Hodak's employment.  [Record No. 89-28, February 21, 2008, Deposition of Bryan Gordon (hereinafter, "Gordon depo.") at 119.] All of Hodak's individual gaffes, mistakes, or failures considered, Gordon felt that Hodak's separation was ultimately necessary:

> . . . because he was completely and utterly inadequate with respect to the job he had been hired to perform.  He did not achieve any of the goals or objectives or milestones which had been agreed upon over time that he would achieve.  It was my feeling that his leadership skills were lacking at best, his industry instincts were unimpressive, his presence both internally and externally was appalling, his preparedness and ability to answer questions was absolutely substandard, and I felt his judgment was poor, and he had completely and utterly lost the confidence of the people who were closest to the project on a day-to-day basis and whose counsel I respected greatly, and had no results to speak of after being teed up with a great deal of opportunity and resources, and I felt that, you know – to use an expression, I felt that he had overpromised and underdelivered in terms of his capabilities, and he was essentially an empty suit.

[Gordon depo. at 100-01.]

Having been fired by UAR GP Services, in late November or early December 2006, Hodak saw Jon Nix of National Coal Corporation, and the chance encounter turned into a discussion of Plaintiff's return to National Coal.  [Hodak depo., Vol. 1, at 17-18.]  On December 15, 2006, Hodak received a contingent offer of employment from National Coal, predicated on Plaintiff's receiving

-8-

a waiver of his convenant not to compete from UAR GP Services. [Record No. 89-45.]  Plaintiff requested a waiver from UAR GP Services in January 2007 and received it on January 29, 2007, after which he became employed by National Coal.

**B.   PROCEDURAL BACKGROUND**

Plaintiff filed suit in this matter on January 10, 2007, averring in his Complaint that the Defendants breached the Employment Agreement (Count I), and committed fraud (Count IV), and that the Madison Defendants tortiously interfered with contractual relations, i.e., the Employment Agreement with UAR GP Services, by and through Gordon's actions (Count V).  Additionally, Plaintiff seeks a declaration that the Non-Competition Agreement by and between Hodak and UAR GP Services' was overly broad and in violation of public policy so as to be unenforceable (Count III).[1] These claims are now before the Court on the parties' cross-motions for summary judgment.  For the reasons which follow, all shall be dismissed.

**II.   STANDARD OF REVIEW**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[1] By prior order, the Court dismissed Plaintiff's claim for violation of KRS 337.055 by Defendants (Count I) [Record No. 19] and his claim in Count III for injunctive relief concerning the Non-Competition Agreement [Record No. 55].

there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party "cannot rest on [her] pleadings," and must show the Court that "there is a genuine issue for trial." *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir. 1997). She "must set forth specific facts showing that there is a genuine issue," such that a jury could reasonably decide in her favor at trial. *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792 (6th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "When a defendant moves for summary judgment on the ground that the plaintiff lacks evidence of an essential element of [her] claim, as in the present case, Rule 56 requires the plaintiff to present evidence of evidentiary quality that demonstrates the existence of a genuine issue of material fact." *Bailey v. Floyd County Bd. of Edu.*, 106 F.3d 135, 145 (6th Cir. 1997). Without such evidence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In considering a motion for summary judgment, the court must construe the facts in the light most favorable to the nonmoving party, but it "need not accept as true legal conclusions

-10-

or unwarranted factual inferences." *Anderson*, 477 U.S. at 255; *Morgan v. Church's Fried Chicken*, 829 F.3d 10, 12 (6th Cir. 1987).

## III. ANALYSIS

### A.   BREACH OF CONTRACT

#### 1.   UAR GP Services Committed No Breach of Employment Contract

Where an employment contract contains a "for cause" termination provision, an employer cannot be held liable for breach of contract unless the decision to terminate someone's employment is not justified. *Big Sandy Rural Elec. Coop. Corp. v. Gambill*, 521 S.W.2d 240, 241 (Ky. 1974).  The employer need not prove that the employee actually performed the misdeeds that led to his termination; rather, the employer must have a good faith basis for having concluded that he did. *See Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 492 (Ky. 1983) (citing *Crest Coal Co. v. Bailey*, 502 S.W.2d 425, 426 (Ky. 1980)); *see also Big Sandy*, 521 S.W.2d at 241.

Under the Employment Agreement, UAR GP Services need meet only one definition of "cause" to justify Plaintiff's termination. [*See* Exh. 1 to Record No. 87-2; §9(a) (providing various definitions of "cause" in the disjunctive).]  The Court finds that, based upon the undisputed evidence presented by the parties, Plaintiff materially breached his confidentiality agreements on at least two occasions, providing more than enough "cause" for his immediate termination

-11-

under the Employment Agreement.[2]  *See* Employment Agreement §
9(a)(2)(v) (providing for immediate termination where there exists
a "material breach of . . . the Confidentiality Agreement executed
by Executive").

     There is no dispute that, while due diligence for potential
acquisitions of TRI and Mann Steel was underway, Plaintiff met with
two equipment dealers in Birmingham, Alabama.  During the first
meeting, Plaintiff confirmed to representatives of Thompson
Tractor, a Caterpillar equipment dealer, that the TRI deal was in
the works.  Second, Plaintiff confirmed to representatives of
Tractor and Equipment Company, a Komatsu dealer, that UAR GP
Services was involved in negotiations with TRI and Mann Steel.
These disclosures, confirmations, statements, allusions, or
whatever one chooses to call them, violated Plaintiff's Non-
Competition Agreement with UAR GP Services, which prohibited the
disclosure of  "transaction related plans" and "identification of
the type . . . or any characteristic" of any investment under
consideration by the UAR Companies within its definition of

_____

[2]

     A material breach exists where a party "fails to perform a
substantial part of the contract or one or more of its essential
terms or conditions, the breach substantially defeats the
contract's purpose, or the breach is such that upon a reasonable
interpretation of the contract, the parties considered the breach
as vital to the existence of the contract."  23 Willison on
Contracts § 63.3 (4th ed. 2008).

-12-

"Confidential Information."[3]  In other words, the disclosures made by Hodak were clearly "material," i.e., essential to the contract or of a nature which would defeat the contract's purpose – to maintain confidentiality.

Thus, UAR GP Services had at least one reason to terminate Plaintiff for cause – a reason which required no written notice or opportunity to cure under the Employment Agreement.[4]  Giving the language of the contract between the parties its normal and ordinary meaning, UAR GP Services was acting within its rights when it decided to terminate Hodak's employment for cause, without notice, after it learned of the breaches of confidentiality.  As such, there was no breach of the Employment Agreement, and UAR GP Services' Motion for Summary Judgment shall be granted.  Further, as UAR GP Services has identified cause for its termination of

---

[3]

These disclosures were also a breach of the confidentiality agreement between the UAR Companies and TRI, which specifically prohibited Plaintiff from disclosing "the existence of any transaction."  [See UAR TRI Confidentiality Agreement ¶ 3.]

[4]

Having determined that UAR GP Services has identified at least one "cause" for termination, as that term is understood in the context of the Employment Agreement, the Court need not and elects not to consider the additional reasons offered by UAR GP Services for Plaintiff's termination:  that he engaged in self-serving discussions concerning the procurement of Mann Steel, that he made statements to TRI executives and others that were contrary to UAR GP Services' interests and were likely to result in material economic damage to the Company, and that Plaintiff had generally engaged in conduct throughout his tenure that constituted dereliction of his duties and did not improve his performance despite repeated demands to do so from Curtz and Gordon.

-13-

Hodak's employment, Hodak's arguments in support of his own Motion for Summary Judgment are without merit.  He is not entitled to a severance benefit under the Employment Agreement, § 9(d), and his Motion for Summary Judgment shall be denied.

### 2.   Contract for Car

Plaintiff has further claimed that UAR GP Services breached its obligation to reimburse him for expenses related to the car that he purchased while employed by UAR GP Services.  Under the Employment Agreement, UAR GP Services was to provide Plaintiff with use of a suitable vehicle, with precise arrangements to be made at a later date.  Plaintiff and Gordon reached an agreement that Plaintiff would purchase a vehicle of his choice, and he would be reimbursed for the "capital costs," out-of-pocket costs, and mileage during his tenure.  Plaintiff purchased a car in June 2006, and Plaintiff has confirmed during the course of this litigation that he was "reimbursed for everything [he] submitted." Accordingly, Hodak's cause of action for breach of contract regarding his vehicle fails and shall be dismissed.

### B.   FRAUD

At common law in Kentucky, a plaintiff may demonstrate fraud by showing, with clear and convincing evidence, that a defendant "a) made a material representation, b) which was false; c) which was known to be false or made recklessly; d) which was made with inducement to be acted upon; e) which plaintiff acted in reliance

-14-

upon; and f) which caused plaintiff injury." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. Ct. App. 2003). Plaintiff must produce affirmative evidence such that a reasonable jury could find that he has met these elements by a clear and convincing standard. [*Id.*]. For someone's misrepresentation to be used as the basis for fraud:

> [I]t must relate to an existing or past fact. If the alleged misrepresentation relates to a future promise or an opinion of a future event, then it is not actionable.

*Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2008); *Rivermont Inn*, 113 S.W.3d 636 (fraud claim was deficient because alleged assurance that application for franchise would be approved, potential for future profitability, and promise to provide certain inventory were prediction of future events only). Further, "opinions and sales puffery . . . will not support a fraud claim." *U.S. Achievement Academy, LLC v. Pitney-Bowes, Inc.*, 458 F.Supp.2d 389, 392 (E.D.Ky. 2006).

In the course of this litigation, Plaintiff has identified three representations made by Gordon as the basis for his fraud claim. [Hodak Depo., Vol. II at 27.] Specifically, Plaintiff complains that Gordon stated that Madison was "here to stay in the coal business," that Madison "had money to back up the deals," was willing to contribute up to $120 million in capital to make the UAR project a success, and, if the UAR project did not succeed, Madison Capital would employ Plaintiff in some other capacity. *Id.* at 27,

-15-

31, 39-40.

In other words, Gordon predicted future success for the UAR project and the potential to muster up funds for deals not yet realized, as well as Madison's potential in the "coal business." Perhaps most tellingly, he spoke of what might happen if he was wrong and UAR GP Services failed. All three statements of which Hodak complains constitute opinions or statements of future hopes or intent. At the time they were made, the statements did not represent then current or past fact. Plaintiff has produced no evidence that the statements were false at the time they were made. Indeed, Hodak has testified he believes that the statements were true at the time they were made. [Hodak depo., Vol. II at 29, 33, 37, 40.] His entire theory rests on the fact that because things worked out differently by September 2006, Gordon must have been lying in May 2006. *See* 35 and 40 (testifying that he determined that statement about continued employment was false only when he was terminated in September 2006); Hodak depo., Vol. II at 38. *Id.* at 29.

This simply is not enough. Plaintiff has offered no proof that Gordon knew his statements were false or knew of and consciously disregarded any risk that what he was saying was false. Accordingly, Plaintiff's allegations of fraud must fail and shall be dismissed.

### C.    NON-COMPETITION AGREEMENT

Count III of Plaintiff's Complaint challenges the validity and enforceability of the non-compete provisions of the Non-Competition Agreement.  Hodak theorizes that the Non-Competition Agreement is invalid and unenforceable because it is overly broad and violates public policy.  [Compl. at ¶ 36.]  While the Court is not of the opinion that the agreement is invalid or unenforceable, the Court is most concerned at this juncture with Hodak's failure to demonstrate how he was restrained, i.e., injured, by the agreement.

UAR GP Services waived the non-competition provisions of the parties' agreement so that Plaintiff could work for National Coal on January 29, 2007.  There is no evidence that Plaintiff was restrained, i.e., that he sought to work for another entity but was prevented from doing so, during the period in which the Non-Competition Agreement was not waived, September 29, 2006 to January 29, 2007.  As Plaintiff has not presented evidence of any injury as a result of the Non-Competition Agreement, Count III shall be dismissed.  *See Harvey Investments, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 166 F.3d 1213 (Table), 1998 WL 767080, at *3 (6th Cir. 1998) ("[W]hile some uncertainty as to the amount of damages is allowable, uncertainty as to the fact . . . of damage caused . . . is fatal.")

### D.    CLAIMS AGAINST OTHER DEFENDANTS

Having determined that all of Plaintiff's claims must fail as

to UAR GP Services, Inc., for the reasons stated above, the Court turns briefly to the claims against the remaining defendants, all of which will also be dismissed.

### 1.    Piercing the Corporate Veil

With regard to Plaintiff's efforts to pierce the corporate veil in order to reach the other defendants (entities related in some capacity to UAR GP Services) and hold them responsible for any wrongs of his employer, UAR GP Services, Plaintiff cannot succeed. The party requesting that the corporate form be disregarded must demonstrate both an abuse of form and a wrong. *See Thomas v. Brooks*, 2005-CA-001983-MR, 2007 WL 1378510 at *3 (Ky. Ct. App. May 11, 2007). As explained above, Plaintiff cannot demonstrate a wrong, so there is no need to proceed further with the veil-piercing analysis.

### 2.    Tortious Interference

Under Kentucky law, a party claiming tortious interference with contract must prove "(1) the existence of a contract; (2) Defendant's knowledge of this contract; (3) Defendant intended to cause its breach; (4) Defendant's conduct caused the breach; (5) this breach resulted in damages to Plaintiff; and (6) Defendant had no privilege or justification to excuse his conduct." *Dennison v. Murray State Univ.*, 465 F.Supp.2d 733, 755 (W.D.Ky. 2006). Considering that there was no breach of the Employment Agreement by Defendant UAR GP Services, Plaintiff cannot meet all of the

-18-

elements of the claim, and it must fail.

###### E.   UAR GP Services' Counter-Claim

Finally, the Court notes that UAR GP Services has filed counterclaims against Hodak, alleging that Hodak breached provisions of the Non-Competition Agreement as well as his fiduciary duty to UAR GP Services by disclosing confidential information to his then-current employer, National Coal, regarding confidential information about UAR GP Services' attempted acquisition of Mann Steel and the Norwest Report used for that purpose.

In the course of responding to the Motion for Summary Judgment filed by the UAR Defendants [Record No. 100], Plaintiff has pointed to evidence of record which indicates that, while National Coal may have subsequently acquired Mann Steel, Hodak did not communicate with anyone at all about National Coal's acquisition of same. [Record No. 100-6, Hodak depo., Vol. 1, at 172; Record No. 100-8, February 26, 2008 Deposition of Daniel A. Roling (hereinafter "Roling depo.")  at 8, 44.] Rather, based upon instructions from Daniel Roling, CEO of National Coal and lead negotiator for National Coal in the Mann Steel transaction, Hodak was excluded from all discussions regarding Mann Steel or any other business development at National Coal.  [Roling depo. at 45, 49-50.]

The counterclaimant has offered nothing further in this regard in the UAR Defendants' Reply in further support of their Motion for

Summary Judgment on Hodak's claims.  These counterclaims are the only remaining claims in this matter, and they appear to suffer from some infirmities - notably, the evidence of record indicates that Hodak never made the communications alleged by UAR GP Services' counterclaims.  In the interest of concluding this matter, all proceedings currently scheduled in this matter shall be continued, and UAR GP Services shall be given the opportunity to show cause why its counterclaim should not be dismissed.

**III. CONCLUSION**

For all of the reasons stated above, Plaintiff's Motion for Summary Judgment shall be denied, and Defendants' Motions for Summary Judgment shall be granted.  Further, Defendant/Counter-Plaintiff UAR GP Services shall show cause why its counterclaims for breach of contract and fiduciary duty against Plaintiff/Counter-defendant Hodak should not be dismissed.

Accordingly, **IT IS ORDERED**:

(1)  that Plaintiff's Motion for Summary Judgment [Record No. 87] shall be, and the same hereby is, **DENIED**;

(2)  that the Motion for Summary Judgment [Record No. 90] of Defendants Madison Capital Management, LLC, and Madison Investment Partners 24, LLC, shall be, and the same hereby is, **GRANTED**;

(3)  that the Motion for Summary Judgment [Record No. 91] of Defendants UAR GP Services, LLC, UAR GP, LLC, UAR GP Holdco, LLC, United American Resources, LP, and UAR MLP, LLC, shall be, and the

same hereby is, **GRANTED**; and

(4)  that Defendant/Counter-Plaintiff shall **SHOW CAUSE** why its counterclaims for breach of contract and fiduciary duties should not be dismissed with prejudice as to Plaintiff/Counter-Defendant Hodak within **ten (10) days** of entry of this Order;

(5)  that all other scheduled proceedings in this matter shall be, and the same hereby are, **CONTINUED GENERALLY.**

This the 18th day of August, 2008.

**Signed By:**

**_Joseph M. Hood_**

**Senior U.S. District Judge**

-21-